RENDERED: APRIL 23, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0121-DG

R. L. P. 

APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2023-CA-1254
WARREN CIRCUIT COURT NO. 23-H-00427-001

COMMONWEALTH OF KENTUCKY 

APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

R.L.P. was involuntarily committed under the recently enacted KRS[1] Chapter 202C after he was deemed incompetent to stand trial for his father's murder. In this appeal, he raises due process and equal protection challenges to Chapter 202C and argues that it was enacted in violation of §§ 46 and 51 of the Kentucky Constitution. After review, we reject his constitutional challenges and affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In Kentucky, the involuntary civil commitment of individuals deemed to be a danger to themselves or others due to mental illness or defect is governed by either KRS Chapter 202A, 202B, or 202C. Under Chapter 202A, a mentally

---

[1] Kentucky Revised Statutes.

ill person[2] may be involuntarily hospitalized if that person presents a danger or threat of danger to themselves or others, can reasonably benefit from treatment, and hospitalization is the least restrictive alternative mode of treatment presently available. KRS 202A.026. Similarly, Chapter 202B provides for the involuntary hospitalization of an individual with an intellectual disability[3] if that person presents a danger or threat of danger to themselves or others, the least restrictive alternative mode of treatment presently available requires placement in an ICF/ID,[4] and treatment that can reasonably benefit the individual is available in an ICF/ID. KRS 202B.040.

As the involuntary commitment criteria under Chapters 202A and 202B require that an individual be capable of benefitting from treatment, if a court finds that an individual cannot reasonably benefit from treatment the court is without authority to commit that individual and that person must be released from state custody. In an attempt to address this loophole—where a person has committed a criminal offense but cannot be tried due to incompetency and cannot be involuntarily committed because they cannot benefit from treatment—the General Assembly passed House Bill (HB) 310. HB 310, *inter alia*, amended KRS 504.110(2) and established a new involuntary commitment process via the creation of KRS Chapter 202C.

---

[2] *See* KRS 202A.011(9) (defining "mentally ill person").

[3] *See* KRS 202B.010(9) (defining "individual with an intellectual disability").

[4] An "ICF/ID" is "an intermediate-care facility approved by the cabinet for the evaluation, care, and treatment of individuals with an intellectual disability[.]" KRS 202B.010(10).

2

Prior to HB 310's enactment, if a court found a defendant both incompetent to stand trial and unlikely to attain competency in the foreseeable future KRS 504.110(2) directed that court to conduct an involuntary hospitalization proceeding under either Chapter 202A or 202B. *See* KRS 504.110(2) (eff. July 15, 1988, to March 31, 2021). HB 310 amended that subsection to now direct that either

> (a) The Commonwealth's attorney's office serving the county of criminal prosecution shall immediately petition the Circuit Court that found the defendant incompetent to stand trial or, if the finding was by a District Court, the Circuit Court in the county of criminal prosecution, to initiate an involuntary commitment proceeding under [KRS Chapter 202C] if the defendant is charged with a capital offense, a Class A felony, a Class B felony resulting in death or serious physical injury, or a violation of KRS 510.040 [(rape in the first degree)] or 510.070 [(sodomy in the first degree)]; or
>
> (b) The court shall conduct an involuntary hospitalization proceeding under KRS Chapter 202A or 202B if the defendant is charged with an offense not listed in paragraph (a) of this subsection.

KRS 504.110(2)(a)-(b).

In turn, KRS Chapter 202C delineates the process for the involuntary commitment of a defendant who is deemed incompetent to stand trial for a qualifying offense under KRS 504.110(2)(a) and who has no substantial probability of regaining competency within 360 days. KRS 202C.020(1). After the Commonwealth's Attorney files a petition to initiate commitment proceedings under Chapter 202C, the "defendant" becomes the "respondent," and the court must immediately assign counsel, a guardian ad litem (GAL), "to represent the needs and best interest of the respondent." KRS 202C.020(2).

3

The respondent must also be represented by an attorney and, if at any time he is not, "the court shall appoint counsel for the [respondent], without a showing of indigency, to be provided by the Department of Public Advocacy." KRS 202C.020(2).

The Chapter 202C commitment process itself is comprised of two phases: a threshold evidentiary hearing pursuant to KRS 202C.030 ("evidentiary hearing") followed by a commitment hearing pursuant to KRS 202C.040 ("commitment hearing").

The evidentiary hearing must be held within twenty days of the filing of a commonwealth's attorney's Chapter 202C petition, and appropriate notice of that hearing "shall be served on all parties." KRS 202C.030(1). All discovery must be provided to the respondent no later than seven days prior to the hearing, and the Commonwealth may not present any evidence it did not provide through discovery. *Id.* The purpose of the evidentiary hearing is "to determine whether sufficient evidence exists to support a finding that the respondent is guilty of the charged crime against him[.]" KRS 202C.030(3). The Commonwealth bears "the burden of proving the sufficiency of the evidence by a preponderance of the evidence." *Id.*

The evidentiary hearing "shall be held before a judge without a jury. The rules of evidence shall apply. [And] [t]he respondent shall be permitted to present evidence and cross examine witnesses." KRS 202C.030(4). The respondent may also "present evidence of affirmative defenses that could be raised at a criminal trial on the charged crime[,]" which must also be proven by

4

a preponderance of the evidence. *Id.* The Commonwealth does not bear the burden of disproving any asserted affirmative defense. *Id.* In addition, although a "respondent may stipulate to potential guilt and waive the hearing[,] [a] stipulation of potential guilt cannot be used against the respondent in any future criminal prosecution or civil litigation." KRS 202C.030(2). Nor can any evidence or statement submitted by the respondent during the evidentiary hearing "be admissible in any criminal prosecution or civil litigation." KRS 202C.030(7).

If, at the conclusion of the evidentiary hearing, "the court determines that insufficient evidence has been presented to support a finding that the respondent is guilty of the charged crime. . . the court shall order the immediate release of the respondent." KRS 202C.030(6). However, if the court determines that sufficient evidence has been presented to support a finding that the respondent is guilty of the charged crime it must immediately schedule a commitment hearing to be held within twenty days. KRS 202C.030(5)(a). It must also order the respondent to be examined by two qualified mental health professionals,[5] at least one of whom must be a physician. KRS 202C.030(5)(b). Those mental health professionals must then certify their findings regarding whether the respondent meets the criteria for involuntary commitment under KRS 202C.050 prior to the commitment hearing. *Id.*

---

[5] *See* KRS 202C.010(11)(a)-(h) (defining "qualified mental health professional").

The commitment hearing "may be held in an informal manner" and need not be held in a courtroom. KRS 202C.040(1). It may instead be conducted in any suitable place "not likely to have a harmful effect on the mental or physical health of the respondent." *Id.* "The manner of proceeding and the rules of evidence shall be the same as those in any criminal proceeding[,]" and "shall be heard by the judge unless a party or guardian ad litem requests a jury." KRS 202C.040(4). The respondent is not permitted to waive his right to the commitment hearing, KRS 202C.040(5), and both "[t]he respondent and the respondent's guardian ad litem shall be afforded an opportunity to testify, to present evidence, and to cross-examine any witnesses." KRS 202C.040(3). During the hearing, the Commonwealth must prove beyond a reasonable doubt that the respondent meets the criteria for involuntary commitment under KRS 202C.050. KRS 202C.040(3)-(4). At the time R.L.P. was committed, those criteria were as follows:

(a) The respondent presents a danger to self or others as a result of his or her mental condition;

(b) The respondent needs care, training, or treatment in order to mitigate or prevent substantial physical harm to self or others;

(c) The respondent has a demonstrated history of criminal behavior that has endangered or caused injury to others or has a substantial history of involuntary hospitalizations under KRS Chapter 202A or 202B prior to the commission of the charged crime; and

(d) A less restrictive alternative mode of treatment would endanger the safety of the respondent or others.

KRS 202C.050(1) (eff. April 1, 2021, to July 15, 2024). After R.L.P. was committed, KRS 202C.050 was amended to require proof of only one of the

6

foregoing criteria.  No arguments against that change, constitutional or otherwise, were raised in this case.  This Court is therefore without jurisdiction to opine on whether that change was constitutionally permissible at this time.

If a respondent is involuntarily committed under KRS Chapter 202C, "the [C]abinet [for Health and Family Services][6] shall place that respondent in a forensic psychiatric facility designated by the secretary [for the Cabinet][7]."  KRS 202C.050(2).  Kentucky's primary forensic psychiatric facility is the Kentucky Correctional Psychiatric Center (KCPC), a licensed psychiatric hospital that performs a number of functions including conducting competency and criminal responsibility evaluations and providing inpatient treatment to individuals that are deemed incompetent to stand trial and are involuntarily committed.  The facility, although therapeutic in nature, is located on the grounds of Luther Luckett Correctional Complex in Lagrange, Kentucky, and is itself secure.

Once an individual has been committed pursuant to Chapter 202C, the statutorily mandated schedule of review hearings is as follows:

> (a) From the initial order of commitment, a standard review hearing shall be conducted not sooner than ninety (90) days and not later than one hundred twenty (120) days;
>
> (b) For the first two (2) years after the initial order of commitment, standard review hearings shall be conducted not less than one hundred eighty (180) days and not more than two hundred ten (210) days from the most recent review;
>
> (c) Beginning two (2) years after the initial order of commitment, a standard review hearing shall be conducted not more than three

---

[6] *See* KRS 202C.010(1) (defining "cabinet").

[7] *See* KRS 202C.010(15) (defining "secretary").

7

> > hundred sixty-five (365) days from the most recent review hearing; and
>
> > (d) A heightened review hearing shall be conducted not more than five (5) years from the initial order of commitment and, thereafter, not more than five (5) years from the most recent heightened review hearing.

KRS 202C.060(2). Moreover, "[i]f at any point. . . it appears that the respondent no longer meets the criteria for involuntary commitment under KRS 202C.050. . . the respondent or the respondent's guardian ad litem may request a review hearing[.]" KRS 202C.060(1)(b). And, during a patient's period of involuntary commitment, they are statutorily entitled to a number of rights including, but not limited to the right to receive visitors, the right to be free from unreasonable use of seclusion and restraint, and the right to the assistance of counsel to uphold those rights. KRS 202C.140(5), (9), (10).

HB 310—which, as discussed above, included both the amendments to KRS 504.110(2) and the creation of Chapter 202C—passed in the Senate by a vote of thirty-seven to zero with one abstention and passed in the House of Representatives by a vote of ninety-one to zero.[8] On April 1, 2021, the Governor of Kentucky signed the bill into law which, due to its emergency clause, became immediately effective.

On February 2, 2022, ten months after HB 310 went into effect, R.L.P. was indicted by a Warren County grand jury for the murder of his father,

---

[8] *See* https://apps.legislature.ky.gov/record/21rs/hb310.html (last accessed Dec. 30, 2025).

John.[9]  He was appointed counsel and entered a not guilty plea.  On February 7, the day of his arraignment, the circuit court ordered that he be sent to KCPC for both a competency evaluation and to determine whether he met the criteria for insanity as defined by KRS 504.060(7).  R.L.P. was admitted to KCPC on June 9, 2022.  The court's order was for an evaluation of up to thirty days, however staff at KCPC thereafter requested and were granted: a thirty-day extension on July 7, a thirty-day extension on August 4, and a sixty-day extension on August 31.  Each request indicated that R.L.P. was being administered antipsychotic medication and/or mood stabilizers for either an unspecified psychotic disorder or schizophrenia; that he had shown some improvement, but still remained psychotic; and that the requesting staff member believed there was a substantial probability that he could regain competency with additional treatment.

The circuit court ultimately held a competency hearing on January 3, 2023, and on the basis of Dr. Daniel Hackman's report found that R.L.P. was incompetent to stand trial pursuant to KRS 504.060(5).  As R.L.P. had been charged with murder, a qualifying offense under KRS 504.110(2)(a), the Warren County Commonwealth's Attorney immediately petitioned for his involuntary commitment under Chapter 202C.  Rather than proceeding with the evidentiary hearing within twenty days of the petition's filing, R.L.P. filed objections to proceeding under the new laws created by HB 310 and a motion

---

[9] As these are confidential proceedings, we will identify both R.L.P.'s father and his brother via pseudonym.

9

to hold HB 310 unconstitutional. He waived his entitlement to having the evidentiary hearing within twenty days in order to have his constitutional arguments ruled on prior to, rather than contemporaneously with, his commitment proceedings.

The arguments raised by R.L.P.'s objections and motion are the sole focus of the appeal now before us. He first argued that the manner in which HB 310 was enacted by the General Assembly violated §§ 46 and 51 of the Kentucky Constitution. He further argued that the evidentiary hearing under KRS 202C.030 violated due process because it allowed for a finding of "guilt" by a preponderance of the evidence and without a jury and because it allowed an incompetent individual to be tried on the facts in a criminal matter. Because this Court reviews the circuit court's rulings on these issues *de novo—see, e.g.,* *TECO/Perry Cty. Coal v. Feltner,* 582 S.W.3d 42, 45 (Ky. 2019)—we reserve an in-depth discussion of R.L.P.'s arguments for Section II of this Opinion below. It suffices to say here that the circuit court rejected each of R.L.P.'s constitutional arguments. Accordingly, the circuit court moved forward with R.L.P.'s commitment proceedings.

R.L.P.'s KRS 202C.030 evidentiary hearing took place over two days in August 2023. During that hearing, the Commonwealth presented testimony from twelve witnesses and admitted 155 exhibits into evidence. That evidence can be fairly summarized as follows. R.L.P. lived in a duplex apartment in Warren County with his father John, they were the only two individuals that lived in that apartment, and John paid rent to their landlord in person on

10

November 1, 2021.  On November 12, R.L.P. drove John's car to Simpson County and was arrested for trespassing on an abandoned property.  R.L.P. was booked into the Simpson County Jail on the same day, and two different nurses that worked for the jail observed a deep cut on R.L.P.'s right hand in the webbing between his thumb and index finger.  R.L.P. had attempted to bandage the wound, which was no longer bleeding and had begun to heal, with a sanitary napkin and a surgical mask.  The nurses did not observe any other injuries.

On November 15, R.L.P. was released from the Simpson County Jail, and on November 16, he was seen by Dr. Daniel Long in the emergency room of a hospital in Warren County.  Dr. Long testified that R.L.P. was difficult to understand due to his pressured speech and disorganized thoughts, both of which were indicators of some sort of mental health episode.  However, R.L.P. stated several times that his father was at home lying in a puddle of blood and that someone had broken in and stabbed both R.L.P. and his father.  Dr. Long also observed the deep cut to R.L.P.'s right hand, which a specialist concluded was a couple of days old and had begun to heal.  Dr. Long did not observe any other injuries.  R.L.P. remained at that hospital for three to four days after which he was admitted to Western State Hospital, a state psychiatric facility.  Following his interaction with R.L.P. on November 16, Dr. Long called 911 out of concern for John and provided dispatch with R.L.P.'s address.

Officer Andre Creek with the Bowling Green Police Department responded to the apartment on November 16, but did not make entry.  He

11

instead spoke with R.L.P.'s and John's neighbor in the duplex, who told them he had not seen John for about a week and had not seen R.L.P. for approximately three days. The neighbor also noted that several newspapers had piled up outside their apartment and that that was unusual.

Eight days later, on November 24, R.L.P.'s brother Adam was released from incarceration in Marion County and drove to the duplex in an attempt to surprise John for Thanksgiving. No one responded to Adam's knocks on the front and back doors, both of which were locked, and Adam noted that a window air conditioning unit was on despite the time of the year. Adam called the police out of concern, but the police would not allow him to enter the apartment. Officers instead told Adam they believed they had located John at a hospital in Tennessee. But at some point, upon calling the cellphone number of that individual, Adam concluded it was not his father.

Adam learned the next day that R.L.P. was at Western State and contacted him by phone. Adam testified that during that conversation R.L.P. rambled and was difficult to understand but he nevertheless told Adam that their father "may have a little blood on him but he's warm" and that he looked like he might be dead but R.L.P. did not think he was. R.L.P. also told Adam that four people in Bowling Green Police Department uniforms had broken in and tried to rob them. Around ten to eleven days later Adam again spoke to R.L.P. on the phone at which point he would only say that John had gone to a

card show.[10]  Following that conversation Adam again called the police and filed a missing persons report.

On December 8, the police at last made entry into the apartment and discovered John's body.  He was lying on his back with the top half of his body in a bathroom and the bottom half sticking out into a hallway that was between R.L.P.'s bedroom and John's bedroom.  The medical examiner who performed John's autopsy concluded that he had sustained forty-five sharp force injuries to his head, neck, torso, and extremities and that he had died from blood loss.  A blanket and a sport coat had been placed on top of John's body, a pillow had been placed beneath his head, a Bible had been put beneath his left hand, and four letters had been placed near the Bible.  All of those items were placed post-mortem.  Each of the four letters were from R.L.P. to John during R.L.P.'s previous incarceration at Kentucky State Penitentiary; one was postmarked December 2008, two were postmarked December 2009, and one was postmarked October 2014.  The window air conditioning unit was still running and was set to sixty-four degrees.

Several newspapers were found in the living room near a recliner, the most recent of which was dated Monday, November 8, 2021, while the oldest newspaper found in the pile outside the front door was dated November 9, 2021.  Bloody, barefoot footprints were found leading into R.L.P.'s bedroom accompanied by "gravity drops" of blood that had fallen straight down and hit

---

[10] John regularly sold collectible trading cards—baseball, basketball, etc.—at a local flea market.

the floor. Blood was also found on the kitchen floor and was smeared in what looked like an attempt to clean it up with a mop also found in the kitchen. A bloody knife was found in the kitchen sink that appeared to be from a butcher block on the kitchen counter. For some inexplicable reason, the investigating officers did not have any of the items in the home forensically tested.

The day after John's body was discovered Detective Kyle Scharlow conducted a recorded interview with R.L.P. at Western State. R.L.P. continued to demonstrate pressured speech and disorganized thoughts during that interview. At first, R.L.P. seemed to claim that several men in Bowling Green Police Department uniforms had broken in and attacked John and thereafter took R.L.P. to the property in Simpson County where he was arrested on November 12. But he also claimed that while John was being murdered, he told R.L.P. that men were trying to "gas the house" and that R.L.P. needed to take the keys to John's car and go to the "safe place" (the abandoned property in Simpson County) and R.L.P. drove himself there. He told the officers that before he left, he checked on John and he was unconscious but still alive so R.L.P. put a blanket over him.

Later in the interview, the officers told R.L.P. that John was dead and that they believed R.L.P. had killed him. At that point R.L.P. began saying that John had been drugging him, raping him, yelling at him, overworking him, suffocating him, and shoving a hose down his throat. Because of this, R.L.P. said he had defended himself and "cut" John. When the officer directly asked R.L.P. if he had stabbed John, he said he did but he did not know how many

14

times because John had "shoved eighteen bottles of pills down [his] throat." R.L.P. said that he sat John on the floor and said, "Daddy I think you're dead" and that he went to the "safe place" to try to get help.

The only evidence presented by R.L.P. during the evidentiary hearing was his own testimony, which was largely incoherent. At various points he claimed that Adam and another man had stabbed his father and that seven men he went to high school with had committed the murder. He also claimed that he had been hit in the head and that John was dead when he woke up. However, he did acknowledge placing the Bible and letters next to John and leaving from the scene in John's vehicle.

Based on the foregoing, the circuit court entered a fourteen-page order on August 25, 2023, which found that there was sufficient evidence to conclude that R.L.P. was guilty of murder by a preponderance of the evidence. R.L.P. does not challenge that finding in the appeal now before us. In accordance with KRS 202C.030(5), the circuit court then scheduled a commitment hearing and ordered that R.L.P. be examined by two qualified mental health professionals.

During R.L.P.'s commitment hearing, for which R.L.P. did not request a jury, the Commonwealth presented three witnesses. The first, Dr. Eric Lesch, is a psychiatrist employed by KCPC. Dr. Lesch testified regarding his sixteen-page report in which he concluded that R.L.P. met KRS 202C.050's criteria for involuntary commitment. Dr. Hackman, the same KCPC forensic psychiatrist that had previously conducted R.L.P.'s competency evaluation, also testified.

15

Dr. Hackman compiled an eighteen-page report in which he likewise opined that R.L.P. satisfied the criteria for involuntary commitment under KRS 202C.050. Finally, Gordon Turner, a detective employed by the Warren County Commonwealth's Attorney's office testified regarding several instances of R.L.P.'s previous criminal behavior. *See* KRS 202C.050(c). Specifically, R.L.P. pled guilty to first-degree wanton endangerment and receiving stolen property in 1993 and attempted murder in 1996 and was convicted of both first-degree assault and second-degree assault in 2006.

As with the evidentiary hearing, the only evidence presented on R.L.P.'s behalf was his own testimony. It was again largely incoherent, but when asked by his GAL he said he would not be a danger to anyone else and that he would take his medication and otherwise follow KCPC's directions if he were released.

The circuit court entered a twenty-three-page order of involuntary and indefinite commitment on September 25, 2023. The order thoroughly recounted the evidence presented during the commitment hearing and found that each of KRS 202C.050's criteria had been proven beyond a reasonable doubt as follows:

> 1. *The respondent presents a danger to himself or others as a result of his mental condition.* [R.L.P.] is currently exhibiting severe psychotic symptoms, unabated by therapeutic doses of potent antipsychotic medications. He clearly is exhibiting delusional thought content and bizarre beliefs. His lack of recognition of his mental illness, and his lack of any coping mechanisms to address it, prevent him from self-governing behavior. He has exhibited, and been convicted of, violence on multiple occasions in the past, and when asked [by Dr. Lesch] if he ever used a gun or a knife violently, replied, "That will come in due time, believe me." For these reasons and others set forth in the opinions of Drs. Lesch and

16

Hackman, and respondent's criminal history, this criteria is met beyond a reasonable doubt;

2. *The respondent needs care, training, or treatment in order to mitigate or prevent substantial physical harm to himself or others.* There is clearly a correlation between [R.L.P.'s] psychotic symptoms and his violence. Though his mood has improved during hospitalization, he continues to be extremely psychotic, exhibiting paranoid delusions and illogical thoughts. Based on the evidence presented, he would, undoubtedly, benefit from ongoing psychiatric medication management and psychotherapy, with the hope that he can bolster his coping skills and address the mental illness that has resulted in past violent behavior. For the reasons stated throughout the testimony of Drs. Lesch and Hackman, continuing care and treatment as he is now receiving is required to prevent harm to others;

3. *The respondent has demonstrated a history of criminal behavior that has endangered or caused injury to others.* His prior violent convictions for Criminal Attempt to Commit Murder and Assault Second Degree with Serious Physical Injury, due to his long-standing mental illness, leads the Court to conclude beyond a reasonable doubt, that the defendant has a demonstrated history of criminal behavior that has endangered or caused injury to others. Though he has numerous prior hospitalizations at Western State and KCPC, this Court cannot find, beyond a reasonable doubt, that these hospitalizations were involuntary based on the evidence at trial. Nevertheless, the [respondent's] demonstrated history of criminal behavior endangering or injuring others is clear, and this criteria is met, beyond a reasonable doubt; and

4. *A less-restrictive alternative mode of treatment other than the Level Six hospitalization[11] would, at this time, undoubtedly endanger the safety of the respondent or others.* His insight into his mental illness is virtually non-existent. He does not

---

[11] Per both Dr. Lesch's and Dr. Hackman's reports, "Level Six hospitalization" refers to the Level of Care Utilization System (LOCUS) tool. LOCUS was designed to assist staff in psychiatric hospitalization settings to determine the most appropriate level of care an individual should receive. Level Six—medically managed residential services—is the highest level. It requires, *inter alia*, that the patient typically be in a locked environment and that seclusion and/or restraint of the patient be available if necessary as well as the twenty-four-hour availability of clinical services.

17

agree with his diagnosis of schizophrenia, and has stated, and demonstrated, that he will not continue treatment if transferred to a less-restrictive setting. Additionally, he would have easier access to weapons and illicit substances outside of a Level Six hospital setting, which would markedly increase his risk of violence. He has threatened future use of weapons during his evaluation with Dr. Lesch. . . . He requires medication management, in a lockdown facility, with 24-hour psychiatric and medical care, in which he could be subject to physical restraint if needed. A less restrictive treatment alternative in a "free-standing facility," would endanger the safety of others at this time.

The circuit court accordingly ordered R.L.P. to be involuntarily committed to KCPC. R.L.P. does not challenge the court's finding that he satisfied KRS 202C.050's commitment criteria in the appeal now before us.

R.L.P. thereafter appealed to the Court of Appeals. *R.L.P. v. Commonwealth*, No. 2023-CA-1254-MR, 2025 WL 420930 (Ky. App. Feb. 7, 2025). Consistent with his arguments before the circuit court, he asserted that HB 310 was unconstitutionally adopted by the General Assembly and that KRS 202C.030 violated the due process rights of mentally ill persons by allowing an adjudication of guilt by a preponderance of the evidence and without a jury. *Id.* at *4-*5. He also, for the first time, asserted that KRS Chapter 202C violated due process by creating "a more restrictive commitment reserved only for those found incompetent." *Id.* at *5. The Court of Appeals affirmed the circuit court's finding that HB 310 was not unconstitutionally passed, and that the evidentiary hearing provided for by KRS 202C.030 is not violative of due process. *Id.* at *4-*7. It declined to address R.L.P.'s argument that Chapter

18

202C created a more restrictive commitment only for incompetent individuals despite his request for palpable error review. *Id.* at *5.

This Court then granted R.L.P.'s motion for discretionary review and held oral arguments. R.L.P.'s constitutional arguments against KRS Chapter 202C and the passage of HB 310 are now properly before us for review.

## II.  ANALYSIS

R.L.P. raises the following arguments: (1) KRS 202C.030 violates due process by allowing an element of commitment to be established by a preponderance of the evidence and without a jury; (2) KRS 202C.030 violates due process by requiring the adjudication of an incompetent individual's guilt of a crime; (3) KRS Chapter 202C violates due process and equal protection by creating a more restrictive commitment that applies only to those found incompetent to stand trial; and (4) the manner in which HB 310 was passed violated §§ 46 and 51 of the Kentucky Constitution.

All of R.L.P.'s arguments were properly preserved for our review save for argument (3). We will review each preserved issue *de novo*, providing no deference to the circuit court's rulings. *TECO/Perry Cty. Coal*, 582 S.W.3d at 45 ("We review questions of law, including the constitutionality of a statute, *de novo*."). We will review R.L.P.'s unpreserved argument for palpable error pursuant to CR[12] 61.02 ("A palpable error which affects the substantial rights of a party may be considered. . . by an appellate court on appeal, even though

---

[12] Kentucky Rules of Civil Procedure.

19

insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

In conducting our review, we remain mindful of "the presumption that the challenged statutes were enacted by the legislature in accordance with constitutional requirements[,]" and that "[a] constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Beshear v. Acree*, 615 S.W.3d 780, 805 (Ky. 2020).

## A. The evidentiary hearing provided for by KRS 202C.030 does not violate due process.

R.L.P. first argues that the evidentiary hearing provided for by KRS 202C.030 fails to provide a respondent adequate due process based on two grounds. The first is that the finding made during the evidentiary hearing— whether the respondent is "guilty" of the crime charged against him—is found without a jury and by a preponderance of the evidence. The second is that KRS 202C.030 allows for the adjudication of an incompetent person's guilt of a crime. We disagree with R.L.P. on both fronts and find *Kansas v. Hendricks*, 521 U.S. 346 (1997) to be instructive regarding each.

In *Hendricks,* the U.S. Supreme Court addressed the constitutional validity of Kansas' Sexually Violent Predator Act ("the Act" or "the Kansas Act"), which provided for the involuntary commitment of a person found to be a "sexually violent predator." *Id.* at 350. It applied to four classes of individuals: those, like Hendricks, who were serving a sentence for their conviction of a sexually violent offense and were scheduled to be released; those charged with

20

a sexually violent offense and deemed incompetent to stand trial; those found not guilty of a sexually violent offense by reason of insanity; and those found not guilty of a sexually violent offense due to mental disease or defect. *Id.* at 352.

After a petition for commitment under the Act was filed, a court would "determine whether 'probable cause' existed to support a finding that the person was a 'sexually violent predator' and thus eligible for civil commitment." *Id.* at 352. The individual would then be evaluated by a mental health professional, and "[a]fter that evaluation a trial would be held to determine beyond a reasonable doubt whether the individual was a sexually violent predator[,]" defined as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." *Id.* at 352-53. The person would then be committed until their personality disorder or mental abnormality had changed such that they were "safe to be at large." *Id.* at 353.

Hendricks was involuntarily committed under the Act and challenged it on the grounds that it violated due process as well as his rights under the Double Jeopardy and *Ex Post Facto* Clauses of the U.S. Constitution. *Id.* at 356, 360-61. The Court first held that the Act satisfied due process requirements. *Id.* at 356. It began by noting that "[a]lthough freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' *Foucha v. Louisiana,*

21

504 U.S. 71, 80 (1992), that liberty interest is not absolute." *Id.* "Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety[,]" and the Court had "consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards." *Id.* at 357. Thus, the Court concluded, it "cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." *Id.*

The Court held that the Kansas Act satisfied due process requirements because it justified an individual's indefinite involuntary commitment on the basis of both a finding that the individual was a danger to themself or others and an additional factor of mental abnormality or personality disorder. *Id.* at 357-58. It explained:

> The challenged Act unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement. Commitment proceedings can be initiated only when a person "has been convicted of **or charged with** a sexually violent offense," and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." Kan. Stat. Ann. § 59–29a02(a) (1994). The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated. As we have recognized, "[p]revious instances of violent behavior are an important indicator of future violent tendencies." *Heller v. Doe,* 509 U.S. 312, 323 (1993)[.]
>
> A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary

22

commitment. **We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality**." *See, e.g., Heller, supra,* at 314–315 (Kentucky statute permitting commitment of "mentally retarded" or "mentally ill" and dangerous individual);[13] *Allen v. Illinois*, 478 U.S. 364, 366 (1986) (Illinois statute permitting commitment of "mentally ill" and dangerous individual); *Minnesota ex rel. Pearson v. Probate Court of Ramsey Cty.*, 309 U.S. 270, 271–272 (1940) (Minnesota statute permitting commitment of dangerous individual with "psychopathic personality"). These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.

*Id*. at 358 (emphasis added) (internal citation and parallel citations omitted).

The Court went on to conclude that the Kansas Act was "plainly of a kind with these other civil commitment statutes[]" that the Court had previously upheld. *Id*. In particular, the Act "[required] a finding of future dangerousness, and then [linked] that finding to the existence of a 'mental abnormality' or 'personality disorder' that [made] it difficult, if not impossible, for the person to control his dangerous behavior." *Id*.

Here, at the time R.L.P. was committed, KRS Chapter 202C certainly comported with *Hendricks*' requirement that an individual's indefinite involuntary commitment be based on that individual's dangerousness coupled with a mental condition. During his final commitment hearing under KRS 202C.040, which R.L.P. does not challenge, the court found beyond a reasonable doubt that R.L.P. satisfied all four of KRS 202C.050's criteria for

---

[13] *Heller* rejected equal protection and due process challenges to KRS Chapters 202A and 202B.

involuntary commitment. Namely: that he presented a danger to himself or others as a result of his mental condition; that he needed care, training, or treatment to mitigate or prevent substantial physical harm to himself or others; that he had a history of criminal behavior that endangered or caused injury to others; and that a less restrictive alternative mode of treatment would endanger his safety or the safety of others. KRS 202C.050(1) (eff. April 1, 2021, to July 14, 2024). Those criteria unmistakably based R.L.P.'s involuntary indefinite commitment on a finding of dangerousness coupled with a mental condition and each were found beyond a reasonable doubt.

R.L.P. seeks to invalidate his involuntary commitment solely by attacking the preliminary evidentiary hearing provided for by KRS 202C.030. As noted, that hearing occurs prior to the final commitment hearing, it is heard by the court rather than a jury, and it addresses whether there is proof by a preponderance of the evidence that the respondent is "guilty"[14] of the crime he was charged with and for which he was deemed incompetent to stand trial. R.L.P. contends that his "guilt" was an element of commitment that was not addressed again during his final commitment hearing, and it thus had to be found beyond a reasonable doubt and by a jury during his evidentiary hearing. To support this argument, he relies on *Denton v. Commonwealth*, 383 S.W.2d

---

[14] Although the General Assembly chose to use the term "guilty" in KRS 202C.030, because KRS Chapter 202C establishes a civil commitment process and not criminal proceedings, we discern that KRS 202C.030 is focused on the concept of criminal responsibility rather than guilt as we know it in a criminal prosecution and thus interpret the use of the word in its civil sense of responsibility for the act.

24

681 (Ky. 1964), *Addington v. Texas*, 441 U.S. 418 (1979), and *S.W. v. S.W.M.*, 647 S.W.3d 866 (Ky. App. 2022).

In *Denton*, Kentucky's then-highest court held that in a "lunacy inquest" the manner of proceeding and rules of evidence must be the same as those in any "criminal or quasi-criminal" proceeding. 383 S.W.2d at 682-83. Denton completed a temporary thirty-five-day commitment for observation under KRS 202.120 (repealed), and thereafter two physicians filed certificates in circuit court stating their opinion that Denton was mentally ill and required confinement. *Id.* at 682. The court treated the certificates as a petition under KRS 202.240 (repealed) which concerned "procedures in cases of formal inquests." *Id.* Denton was not provided with counsel until two- and one-half hours before the formal inquest, and during the inquest affidavits from the two physicians were read into the record by the county attorney in lieu of the physicians testifying and being subject to cross-examination. *Id.* The *Denton* Court reversed, noting that

> [a]lthough lunacy inquests are not concerned with criminal intent or criminal acts they may result in depriving the defendant of his liberty and his property. This deprival should be obtained only by the due processes of law under constitutional guarantees.
>
> We have therefore concluded that when a proceeding may lead to the loss of personal liberty, the defendant in that proceeding should be afforded the same constitutional protection as is given to the accused in a criminal prosecution.

*Id.* The Court took exception to the lower court's assumption that the physicians were not required to testify in person, noting the right to confrontation protected by both the U.S. and Kentucky Constitutions. *Id.* at

25

683.  It further believed that the statutes governing lunacy inquests improperly shifted the burden of proof from the Commonwealth to the respondent.  *Id.*  It concluded by holding that "the burden of proof. . . and the manner of proceeding and the rules of evidence should be the same as those in any criminal or quasi criminal proceeding[.]"  *Id.*

Over a decade after *Denton*, the U.S. Supreme Court issued *Addington*, which addressed what standard of proof was the minimum, constitutionally acceptable standard for involuntary commitment to a mental hospital.  441 U.S. at 425-33.  The Court held that the preponderance of the evidence standard was insufficient, and at a minimum the standard of proof must be proof by clear and convincing evidence.  *Id.* at 427, 431.  While it explicitly declined to require all states to apply a proof beyond a reasonable doubt standard, it acknowledged that some states, including Kentucky, had chosen to do so.  *Id.* at 431.

Finally, *S.W. v. S.W.M.* addressed the constitutionality of the Matthew Casey Wethington Act for Substance Abuse Intervention (Casey's Law), codified at KRS 222.430-222.437.  647 S.W.3d at 873.  Casey's Law allows an individual to be ordered to undergo involuntary treatment for substance use disorder (SUD) if that individual: suffers from SUD; presents an imminent threat of danger to themselves or others as a result of SUD, or there is a substantial likelihood of such a threat in the future; and can reasonably benefit from treatment.  KRS 222.431.  The respondents in *S.W.* challenged the then-existing version of KRS 222.433, which allowed a court to order a

respondent to undergo involuntary SUD treatment after holding a single hearing in which it determined "if there [was] probable cause to believe the respondent" met the criteria for involuntary treatment under KRS 222.431. *Id.* The Court of Appeals, in relevant part, reinforced that the burden of proof for involuntary commitment in Kentucky is proof beyond a reasonable doubt. *Id.* at 874. It accordingly held that "the probable cause standard of proof set out in Casey's Law is unconstitutional." *Id.*

Thus, *Denton* and *S.W.* have no application in this case, apart from their holdings that proof beyond a reasonable doubt is required for involuntary commitment, which this Court does not dispute. In *Denton,* the **final** commitment hearing that directly resulted in the respondent's commitment did not provide the respondent with adequate assistance of counsel and did not allow the respondent the opportunity to cross-examine the physicians whose opinions formed the basis of the commitment proceedings against her. In *S.W.*, the **sole** hearing which resulted in the respondent's involuntary commitment required proof by only probable cause. Whereas, in R.L.P.'s final commitment hearing under KRS 202C.040, each of the commitment factors under KRS 202C.050 were proven by the Commonwealth beyond a reasonable doubt; he was given the option to have a jury (which he waived); the witnesses against him testified and were thus available to his counsel and GAL for cross-examination; and he presented evidence on his own behalf.

R.L.P. attempts to invalidate the full complement of due process protections afforded him during his commitment hearing by re-framing the

27

finding made during the evidentiary hearing as an "element of commitment" that must be found by a jury beyond a reasonable doubt. But the elements of commitment under KRS Chapter 202C are those listed in KRS 202C.050, and none of those criteria require a finding of "guilt" of the underlying offense. We instead agree with the Commonwealth that the KRS 202C.030 evidentiary hearing is merely a preliminary screening process similar to those under KRS 202A.051(6)(a), KRS 202B.100(8), and KRS 222.433(2).

An initial hearing or determination with a lower standard of proof followed by a hearing with a heightened standard of proof is the typical procedure under our involuntary commitment statutes. For example, KRS Chapter 202A requires a "preliminary hearing" to determine whether "there is probable cause to believe the person should be involuntarily hospitalized[,]" or, in other words, whether the person meets the criteria for commitment in KRS 202A.026. KRS 202A.051(6)(a). Then, following that preliminary hearing, the court must hold a "final hearing" to determine "if the respondent should be involuntarily hospitalized." KRS 202A.051. And, while the burden of proof during the preliminary hearing is probable cause, the burden of proof during the final hearing is "proof beyond a reasonable doubt." KRS 202A.076(2).

Likewise, KRS Chapter 202B requires a court to find, following a "preliminary hearing," that "there is probable cause to believe the respondent should be involuntarily admitted[]" (i.e., that the respondent satisfies the criteria for involuntary admission in KRS 202B.040). KRS 202B.100(8). That preliminary hearing is followed by a "final hearing" in which the standard of

28

proof is "clear and convincing evidence"[15] that the respondent should be involuntarily admitted. KRS 202B.100(8); KRS 202B.160(2). And, during the pendency of the Court of Appeals' ruling in *S.W.*, Casey's Law was amended to require an initial finding by the court "that there is probable cause to believe the respondent should be ordered to undergo treatment" (meets the criteria for involuntary commitment under KRS 222.431), followed by a hearing where the court must find "proof beyond a reasonable doubt that the respondent should be ordered to undergo treatment." KRS 222.433(2),(3).

Certainly, a determination of a respondent's eligibility for commitment under KRS 202C.050 by a preponderance of the evidence during the KRS 202C.030 evidentiary hearing, as opposed to his "guilt" of the underlying offense, would place KRS Chapter 202C in more alignment with our other civil commitment statutes. However, it is not the business of this Court to tell the General Assembly how to "best" write an otherwise constitutional statute; we are not the men and women in that proverbial arena. Rather, our bailiwick is to determine whether a given statute, as written, is violative of either the U.S. or Kentucky Constitution, and in the case KRS 202C.030, we cannot conclude that such a violation has occurred.

The circuit court did not have the authority to involuntarily commit R.L.P. after the KRS 202C.030 evidentiary hearing. R.L.P. was not subject to

---

[15] It does not appear that KRS 202B.160's use of the clear and convincing standard rather than proof beyond a reasonable doubt has ever been challenged in state court.

commitment until after the Commonwealth met its burden of proof in the KRS 202C.040 commitment hearing. In turn, that commitment hearing required proof beyond a reasonable doubt of each of the commitment criteria in KRS 202C.050 which, when considered together, incorporate both the requisite finding of dangerousness and couple it with a mental condition that the U.S. Supreme Court has routinely upheld in challenges to involuntary commitment statutory schemes. *Hendricks*, 521 U.S. at 358. The final commitment hearing under KRS 202C.040 also explicitly requires that "[t]he manner of proceeding and the rules of evidence [to] be the same as those in any criminal proceeding[,]" and that "the respondent and the respondent's [GAL] shall be afforded an opportunity to testify, to present evidence, and to cross-examine any witnesses." KRS 202C.040(3)-(4). It also entitles the respondent to have a jury be the fact finder. KRS 202C.040(4). Thus, although this Court is admittedly perplexed by the General Assembly's utilization of what is termed a "guilt" determination during the initial KRS 202C.030 evidentiary hearing, we cannot say that the fact that the initial criminal responsibility determination is made by a preponderance of the evidence and without a jury renders it violative of due process.

R.L.P. next asserts that KRS Chapter 202C violates due process because it does not create a new civil commitment process and is instead a pretext that permits the Commonwealth to prosecute an incompetent defendant's guilt of a crime via the evidentiary hearing provided for in KRS 202C.030. Without question, the prohibition against the criminal prosecution of an incompetent

30

defendant has long stood as a pillar of the Due Process Clause. *See, e.g.*, *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) ("We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'"). However, it is equally beyond question that in order for this Court to hold that KRS 202C.030 permits the adjudication of an incompetent person's guilt of a crime, we must first conclude that KRS Chapter 202C creates a criminal, rather than civil, proceeding. We again look to *Hendricks*.

In addition to his due process claims, Hendricks argued that because "punishment" under the Kansas Act "[was] predicated upon past conduct for which he [had] already been convicted and forced to serve a prison sentence, the Constitution's Double Jeopardy and *Ex Post Facto* Clauses [were] violated." *Hendricks*, 521 U.S. at 361. The Court rejected both arguments based on its holding that the Act did not establish criminal proceedings. *Id.* at 361-69.

The Court expounded that "[t]he categorization of a particular proceeding as civil or criminal is first of all a question of statutory construction[,]" i.e., it had to first "ascertain whether the legislature meant the statute to establish civil proceedings." *Id.* at 361. It concluded that the Kansas Legislature's intent to create a civil proceeding was clear based on both the statute's placement within the Kansas probate code as opposed to its criminal code as well as its description of the Act as "creating a 'civil commitment procedure.'" *Id.* (emphasis omitted). Thus, "[n]othing on the face of the statute [suggested] that the legislature sought to create anything other than a civil commitment scheme

31

designed to protect the public." *Id.* And, while "a civil label is not always dispositive," Hendricks had failed to satisfy the heavy burden of overcoming the legislature's manifest intent by providing "the clearest proof that the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] stated intention to deem it civil." *Id.* (internal quotation marks omitted).

Moreover, the *Hendricks* Court opined that "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Id.* at 361-62. It reasoned that "[t]he Act's purpose is not retributive because it does not affix culpability for prior criminal conduct. Instead, such conduct is used solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Id.* at 362. Furthermore, the Act "[did] not make a criminal conviction a prerequisite for commitment" as "persons absolved of criminal responsibility may nonetheless be subject to confinement under the Act." *Id.* It concluded that the "absence of the necessary criminal responsibility suggests that the State is not seeking retribution for a past misdeed[,]" and accordingly "the fact that the Act may be tied to criminal activity is insufficient to render the statute punitive." *Id.* (internal quotation marks omitted). The Court further concluded that the Act was not meant to function as a deterrent. *Id.* It reasoned that, by definition, persons committed under the Act were suffering from a mental abnormality that prevented them from controlling their behavior and that such persons were "unlikely to be deterred by the threat of confinement." *Id.* at 362-63.

32

Also pertinent here, Hendricks argued that his potentially indefinite confinement under the Act, coupled with the State's use of procedural safeguards traditionally utilized in criminal trials, rendered the proceedings criminal in nature. *Id.* at 363-64. The Court rejected this, reasoning that "[f]ar from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." *Id.* at 363. And, if at any time a confined individual was adjudged to be "safe at large" he would be statutorily entitled to immediate release. *Id.* at 364. Thus, "commitment under the Act [was] only *potentially* indefinite." *Id.* Regarding Hendrick's latter argument, the Court held that "the State's decision 'to provide some of the safeguards applicable to criminal trials cannot itself turn these proceedings into criminal prosecutions.'" *Id.* (quoting *Allen*, 478 U.S. at 372). The Court thus concluded:

> Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent. We therefore hold that the Act does not establish criminal proceedings and that involuntary confinement pursuant to the Act is not punitive. Our conclusion that the Act is nonpunitive thus removes an essential prerequisite for both Hendricks' double jeopardy and *ex post facto* claims.

*Id.* at 368-69.

33

Based on the foregoing, KRS Chapter 202C clearly establishes civil, rather than criminal, proceedings. As did the *Hendricks* Court, we first look to the statute itself to ascertain legislative intent. *Id.* at 361. KRS Chapter 202C is located under "Title XVII. Economic Security and **Public Welfare**" rather than "Title L. Kentucky Penal Code." (Emphasis added). And, although KRS Chapter 202C does not explicitly state that it is creating a new civil commitment procedure, it was deliberately placed after KRS Chapters 202A and 202B, both of which are long-standing civil commitment statutory schemes.

KRS Chapter 202C also serves neither the retributive nor deterrent objectives of criminal punishment. Its purpose is not retributive because it does not make a criminal conviction a prerequisite for commitment. It in fact does the inverse, as it is a *lack* of competence to stand trial for a qualifying offense under KRS 504.110(2)(a) that serves as the sole triggering mechanism for commitment under KRS Chapter 202C. And commitment under Chapter 202C is not punitive in nature. While it is true that KCPC is located on the grounds of a state penitentiary, its goals in relation to its involuntary commitment patients are first and foremost rehabilitative in nature, not penal. KCPC is meant to provide medication and therapy—in addition to basic necessities such as shelter, clothing, food, etc.—to its Chapter 202C patients with an aim towards those patients regaining competency.

In that vein, Chapter 202C specifically provides a schedule of review hearings to ensure continued commitment is warranted and directs that "if at

34

**any** point. . . it appears that the respondent no longer meets the criteria for involuntary commitment[,]" the respondent or the respondent's GAL may request a review hearing. KRS 202C.060(1)(b) (emphasis added). If a respondent no longer meets the criteria for commitment, he must be released. This is in obvious contrast to an imposed sentence following a criminal conviction, for which an individual may not be released from "custody," whether that be institutionalization or parole, until the sentence is completed. As with the Act at issue in *Hendricks*, this means that commitment under KRS Chapter 202C is only potentially indefinite.

KRS Chapter 202C is also highly unlikely to serve as a deterrent to individuals who are eligible for commitment thereunder. As noted, the triggering mechanism for commitment under this statute is being charged with one of the serious qualifying offenses listed in KRS 504.110(2)(a) and being deemed incompetent to stand trial for that offense with no substantial probability of attaining competency within the foreseeable future. A criminal defendant is deemed incompetent to stand trial if as a result of mental condition, he lacks the capacity to appreciate the nature and consequences of the proceedings against him and cannot participate rationally in his own defense. KRS 504.060(5). An individual who is mentally ill enough to satisfy that definition is unlikely to be deterred by the threat of confinement.

Based on the foregoing, R.L.P. has failed to satisfy the heavy burden of providing clear proof that the KRS Chapter 202C is so punitive either in purpose or effect as to negate the General Assembly's manifest intent to deem

35

it a civil proceeding. *Hendricks*, 521 U.S. at 361. Accordingly, Chapter 202C does not adjudicate the guilt of or criminal responsibility an incompetent individual. This renders R.L.P.'s arguments under *In re Gault*, 387 U.S. 1 (1967), *In re Winship*, 397 U.S. 358 (1970), and *Commonwealth v. B.H.*, 548 S.W.3d 238 (Ky. 2018), inapplicable.

In *Gault*, the U.S. Supreme Court held that in juvenile criminal proceedings, a juvenile has the right to notice of the charges against him, the right to counsel, the right to confrontation and the cross-examination of witnesses, and the privilege against self-incrimination. 387 U.S. at 31-57. In *Winship*, the Supreme Court held that a juvenile's guilt of a crime must be proven beyond a reasonable doubt. 397 U.S. at 368. And in *B.H.*, this Court held that a juvenile criminal defendant has the right to have his competency to stand trial adjudicated by a district court before the decision regarding whether the case should be transferred to circuit court is made. 548 S.W.3d at 247-48. As discussed, proceedings under KRS Chapter 202C are not criminal proceedings, let alone juvenile criminal proceedings. And, at any rate, Chapter 202C affords the rights to notice, counsel, and confrontation during both the evidentiary and commitment hearings as well as proof beyond a reasonable doubt during the final commitment hearing.

36

**B. KRS Chapter 202C does not violate the Equal Protection or Due Process Clauses by creating a more restrictive commitment only for those found incompetent to stand trial.**

As previously discussed, R.L.P. concedes this argument was not properly preserved for our review but has requested review for palpable error pursuant to CR 61.02.

> The language of CR 61.02 is identical to its criminal law counterpart, RCr[16] 10.26, and we interpret that language identically. . .
>
> To qualify as "palpable error" under either rule, an error "must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth,* 206 S.W.3d 343, 349 (Ky. 2006). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte.*" *Lamb v. Commonwealth,* 510 S.W.3d 316, 325 (Ky. 2017).

*Nami Res. Co., L.L.C. v. Asher Land & Mineral, Ltd.,* 554 S.W.3d 323, 338 (Ky. 2018). R.L.P. argues that Chapter 202C creates an aggravated or enhanced commitment system reserved solely for incompetent persons, and that it is accordingly unconstitutional pursuant to *Baxstrom v. Herold,* 383 U.S. 107 (1966), *Jackson v. Indiana,* 406 U.S. 715 (1972), and *Foucha v. Louisiana,* 504 U.S. 71 (1992).

In *Baxstrom,* the U.S. Supreme Court held that a New York prisoner was denied equal protection "by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York[,]" and was further denied equal protection "by his civil commitment to an institution

---

[16] Kentucky Rule of Criminal Procedure.

maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those. . . nearing the expiration of a penal sentence." 383 U.S. at 110. No such equal protection violations occurred in this case. R.L.P. was not committed under a statutory scheme that failed to afford him the same rights that are granted to those committed under our other involuntary commitment statutes; tellingly, R.L.P. has failed to identify any rights that were not afforded to him that are provided to respondents under any other involuntary commitment statute. Moreover, R.L.P. was adjudged beyond a reasonable doubt to be both mentally ill and dangerous.

> R.L.P. also perplexingly cites *Jackson*'s holding
>
> that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.

406 U.S. at 738. The Indiana statutory scheme at issue in that case provided that if a criminal defendant was deemed incompetent to stand trial, the "trial is delayed or continued and the defendant is remanded to the state department of mental health to be confined in an 'appropriate psychiatric institution.'" *Id.* at 720. The defendant then had to remain in that institution until "[w]henever the defendant shall become sane[,]" and the statutes did not provide for periodic review of the defendant's competency. *Id.* (internal quotation marks omitted). Again, R.L.P. was not involuntarily committed based solely on his

38

incompetency to stand trial. He was involuntarily committed because the Commonwealth presented proof beyond a reasonable doubt that he satisfied each of the commitment criteria in KRS 202C.050 which, in turn, require combined findings of both dangerousness and mental illness. And periodic, statutorily mandated review of his continued satisfaction of those criteria are available to him. KRS 202C.060.

Last, R.L.P. cites to *Foucha*'s holding that due process prohibits the commitment of a defendant found not guilty by reason of insanity in the absence of a finding that he is, at the time of commitment, both mentally ill and dangerous. 504 U.S. at 77-78. To state the obvious, R.L.P. was not found to be not guilty by reason of insanity, as he never attained competency to stand trial in the first instance. And, again, he was found to be both dangerous and mentally ill beyond a reasonable doubt prior to his involuntary commitment.

Additionally, we highlight that KRS Chapter 202C is not the only involuntary commitment proceeding in Kentucky that is triggered by a criminal defendant's incompetence to stand trial. Pursuant to KRS 504.110(2)(b), those deemed incompetent to stand trial for any criminal offense not listed in KRS 504.110(2)(a) are also subject to involuntary commitment under either KRS Chapter 202A or 202B. No palpable error occurred.

## C. The enactment of HB 310 violated neither §46 nor §51 of the Kentucky Constitution.

For his last assertion, R.L.P. argues that the manner in which the General Assembly passed HB 310 violated §§ 46 and 51 of the Kentucky Constitution. A description of that enactment process is therefore necessary.

HB 310 was first introduced on February 2, 2021, as part of the 2021 regular session of the General Assembly.[17]  It was initially titled "AN ACT relating to the victims of sex offenses[,]" and contained four sections.  Section 1 amended KRS 439.340 regarding parole board notifications to victims of certain sex crimes.  Section 2 amended KRS 510.037 to add several offenses for which convictions constitute applications for an interpersonal protective order.  Section 3 amended the definitions of "sexual assault," "stalking," and "strangulation" in relation to civil protection orders under KRS 456.010.  And Section 4 amended the definition of "strangulation" under KRS 403.720, our domestic violence and abuse statutes concerning divorce and child custody.

The first reading of HB 310 in the House occurred on March 3, and the second reading took place on March 4.  Thereafter, on March 12, floor amendments (1) and (2) were filed.  Floor amendment (1) added Section 5 through Section 23 to the bill's original language.  Section 5 made the previously discussed amendments to KRS 504.110(2) requiring involuntary commitment proceedings under KRS Chapter 202C when a defendant is deemed incompetent to stand trial for certain qualifying criminal offenses and proceedings under either Chapter 202A or 202B when a defendant is deemed incompetent to stand trial for any offense that does not qualify for commitment under Chapter 202C.  Section 6 through Section 22 established the creation of

---

[17] All of the information that follows regarding the bill's passage was found on https://apps.legislature.ky.gov/record/21rs/hb310.html (last accessed January 8, 2026).

40

KRS Chapter 202C, and Section 23 amended KRS 31.110 to ensure that every person, whether needy or not, is entitled to representation if they are subject to Chapter 202C proceedings. Floor amendment (2) changed the title of HB 310 to "AN ACT relating to crimes and punishments."

Three days later, floor amendments (3) and (4) were filed. Floor amendment (3) added Section 24 to the bill which declared an emergency in order to make the bill effective immediately upon its approval by the Governor in addition to the changes made under amendment (1). Floor amendment (4) changed the title of the bill to "AN ACT relating to crimes and punishments and declaring an emergency." On the same day, the bill was read for the third time in the House and passed with a vote of ninety-six to zero with floor amendments (3) and (4).

The bill was then received in the Senate and was sent to the Senate Committee on Committees. Thereafter, the first reading occurred, and it was returned to the Committee on Committees, which transferred it to the Senate Judiciary Committee. The following day, the second reading occurred, and it was returned to the Senate Judiciary Committee. Nearly two weeks later it was sent to the Senate Rules Committee with a Senate Committee Substitute. The bill was then read for a third time and passed thirty-seven to zero with one abstention with the Senate Committee Substitute. Because the Senate had recommended minor edits to HB 310 via the Committee Substitute, the bill was then returned to the House and was sent to the House Rules Committee. The House ultimately concurred with the Senate Committee Substitute and on

March 29, 2021, the House passed HB 310 for the second time by a vote of ninety-one to zero. The bill was then signed into law by the Governor on April 1.

R.L.P. argues that the foregoing process violated § 46's directive that "[e]very bill shall be read at length on three different days in each House, but the second and third readings may be dispensed with by a majority of all the members elected to the House in which the bill is pending[,]" colloquially known as the three readings clause, as well as § 51's directive that "[n]o law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title[.]" Ky. Const. § 46, 51.

He relies upon *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018), in which this Court declared Senate Bill (SB) 151 void because its passage did not comply with § 46. *Bevin* concerned the General Assembly's efforts during its 2018 session to address pressing concerns about the inadequate funding of our public pension systems. *Id.* at 78. In response to this looming crisis, the Senate initially introduced SB 1 with the title "AN ACT relating to retirement[.]" *Id.* Public resistance to SB 1 ultimately caused it to die in committee. *Id.* at 78-79.

Then, three days before the legislative session was to end, the House Committee on State Government selected a bill which had already been given one or more readings by each chamber and "amended" it by inserting most of SB 1's original language. *Id.* at 79. The Committee selected SB 151, an eleven-page bill concerning contracts for the acquisition of local wastewater facilities

42

titled, "AN ACT relating to the local provision of wastewater services." *Id.* SB 151 was amended by a House Committee Substitute which contained the pension reform language; all eleven pages of SB 151's original text were removed and replaced with 291 pages of text addressing pension reform from SB 1. *Id.* It was then given a third reading in the House while still bearing the title of a wastewater management bill. *Id.* at 80. It was not until after the House voted to pass HB 151 by a vote of forty-nine to forty-six with five abstentions that its title was amended to reflect its relation to retirement and public pensions. *Id.* Thus, it was never read in either chamber as an act relating to retirement and public pensions. *Id.*

In addressing the meaning of the three readings clause on appeal, the *Bevin* Court opined that "[a]t first glance, one might reasonably surmise that to be 'read at length' in each House . . . the words of each bill must be collectively looked at and spoken aloud in its entirety." *Id.* at 90. However, this Court took a more pragmatic approach to interpreting the clause and concluded that "such a literal interpretation of the words produces an unreasonable and absurd result[,]" and that "[t]he framers of our Constitution were not intent upon burdening the legislature with such an absurd waste of time." *Id.* Moreover, the court did

> not purport to state within the pages of [the] opinion all the ways by which a bill may be "read" in compliance with § 46, nor [did it] conclude that there is only one way that a bill can be "read" in compliance with § 46. [It was] satisfied that the common legislative practice of reading only the title of the bill and electronically publishing simultaneously the full text of the bill to

43

> the electronic legislative journal available on every legislator's desk
> satisfies the constitutional mandate of § 46.

*Id.* The Court further acknowledged that "legislators may amend the text of a bill between readings without running afoul of § 46[,]" and that "[o]rdinarily, the revised text is some variation of the original text and remains consistent with the theme reflected in the title of the bill." *Id.* at 91-92 (citing *Hoover v. Bd. of Cty. Comm'rs, Franklin Cty.*, 482 N.E.2d 575, 579 (Ohio 1985) ("[A]mendments which do not vitally alter the substance of a bill do not trigger a requirement for three considerations anew of such amended bill."); *Magee v. Boyd*, 175 So.3d 79, 114 (Ala. 2015) ("[W]e hold that an amended bill or a substitute bill, if germane to and not inconsistent with the general purpose of the original bill, does not have to be read three times on three different days to comply with § 63 [Alabama's three readings requirement.]")).

The issue with the process that occurred in *Bevin*, is that "[a] fundamental premise underlying [the] holding that reading a bill 'by title only' is an appropriate mode of compliance with § 46 . . . is the assumption that the title so read is germane to the law being enacted[]" in accordance with § 51. *Id.* at 91. This Court concluded it would be absurd to assume § 46 was satisfied when the title was read as "AN ACT relating to the local provision of wastewater services" when the content of the nearly 300-page bill concerned only pension reform. *Id.* Thus, in consideration of the fact that the purpose of § 46 "was to ensure that every legislator had a fair opportunity to fully consider each piece of legislation that would be brought to a vote[,]" and that such a purpose

"cannot be achieved by reading a bill only by its title which has no rational relationship to the subject of the law being enacted[,]" this Court held that SB 151 was void. *Id.* at 93-94.

Clearly, the changes made to HB 310 during its enactment were not nearly as drastic as what occurred in *Bevin*. R.L.P. does not dispute this but argues that they did not need to be in order to violate §§ 46 and 51. He contends that in order to comply with those sections, the House had to read the HB 310 at least once under the title "AN ACT relating to crimes and punishments and declaring an emergency" and suspend the remaining readings by majority vote. And, because that did not occur, HB 310 must be declared void in its entirety. We disagree.

HB 310 was read once in the House under the title "AN ACT relating to crimes and punishments and declaring an emergency." At that time, the substance of the bill included the establishment of KRS 202C and the concomitant amendments to KRS 504.110(2). The bill passed unanimously in the House and was thereafter read three times in the Senate without any major changes and was passed in that chamber unanimously with one abstention. It was then returned to the House for consideration once again with a Committee Substitute and was again passed by the House unanimously. If the purpose of § 46 is "to ensure that every legislator [has] a fair opportunity to fully consider each piece of legislation that would be brought to a vote[,]" *id.* at 92, then clearly that purpose was satisfied here.

45

Moreover, the title of HB 310 "is not false or misleading[.]" *Yeoman v. Commonwealth, Health Pol'y Bd.*, 983 S.W.2d 459, 476 (Ky. 1998). While it is true that KRS Chapter 202C establishes a new civil commitment procedure, the trigger for that procedure always begins with a defendant being charged with a qualifying crime under KRS 504.110(2)(a) and being deemed incompetent to stand trial for that crime. "The purpose of § 51 is to prevent [the] mislabeling of legislation so as to mislead. Unless the title of an act is wholly inaccurate so as to actually deceive, it will be held to be constitutional under § 51[.]" *Id.* The title of HB 310 as "AN ACT relating to crimes and punishments and declaring an emergency" is not misleading so as to actually deceive and is therefore sufficient to pass muster under § 51.

Based on the circumstances of HB 310's essentially unanimous passage by the legislative branch of our government, followed by endorsement from the head of our executive branch, we would be loath to render it void without a clear violation of either § 46 or § 51. Because we cannot conclude such a violation occurred, we decline to do so.

### III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting. Bisig, Goodwine, Keller, Nickell, and Thompson, JJ., concur. Conley, J., dissents by separate opinion.

CONLEY, J., DISSENTING: With due respect to the well-written opinion of Chief Justice Lambert, I must dissent as I disagree that KRS 202C.030, at the time in question, imposed a constitutionally sound test for commitment.

46

That statute required a trial court to determine whether the accused is *guilty* of the crime alleged as a condition of commitment under a preponderance of the evidence standard. That this determination was presented as a mere preliminary matter or a threshold question does not change the fact that but for the trial court's ruling that R.L.P. was *guilty*, R.L.P. could not be committed. As I understand our law, "when a proceeding may lead to the loss of personal liberty, the defendant in that proceeding should be afforded the same constitutional protections as is given to the accused in a criminal prosecution." *Denton v. Commonwealth,* 383 S.W.2d 681, 682 (Ky. 1964). *Denton,* therefore, required the guilt determination to be had under the beyond a reasonable doubt standard just as it would be in a purely criminal inquiry. *Miller v. Commonwealth,* 77 S.W.3d 566, 576 (Ky. 2002) (quoting *In re Winship,* 397 U.S. 358, 364 (1970)).

The General Assembly chose to use the word "guilt" in the statute. While that word alone did not transform KRS 202C into a purely criminal inquiry, the fact remains the trial court was required, as a precondition to commitment, to determine whether R.L.P. was guilty of the crime he was charged with. That question was answered by applying the preponderance of the evidence standard. The question of guilt would have never again been re-examined, even though it formed an essential part of the foundation leading to his commitment. Like my predecessors on the *Denton* court, I cannot "assume that the bare accusation of insanity acts as a means of proper classification so that a person so accused may be deprived of his liberty under this singular statute

47

without granting to him his full constitutional guarantees." *Id.* at 683. Since guilt of the crime charged was a condition of commitment, then *Denton* required that guilt must be proven beyond a reasonable doubt. KRS 202C failed at the time in question to adhere to this standard although I now understand the General Assembly has amended the statute and this issue has no prospective application in interpreting the statute. Therefore, I respectfully dissent.

COUNSEL FOR APPELLANT:

Timothy G. Arnold
Emily H. Rhorer
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General of Kentucky

John H. Heyburn
Principal Deputy Solicitor General

Jacob M. Abrahamson
Assistant Solicitor General